<div style="text-align:center">

# EPSTEIN SACKS PLLC
ATTORNEYS AT LAW
100 LAFAYETTE STREET
SUITE 502
NEW YORK, N.Y. 10013

</div>

BENNETT M. EPSTEIN: (917) 653-7116
SARAH M. SACKS: (917) 566-6196

May 8, 2020

Hon. Alvin K. Hellerstein
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

Filed by ECF

Re: *United States v. Edwin Gonzalez*
19 Cr. 708 (AKH)

Dear Judge Hellerstein:

We represent the defendant Edwin Gonzalez pursuant to the Criminal Justice Act. He is scheduled to be sentenced by the Court on May 22, 2020. We submit this letter and attachments (including letters from Edwin's mother and long-term girlfriend), as our presentencing memorandum. For the reasons stated below, we respectfully submit that a sentence of 28 months is one that is "sufficient but not greater than necessary" to serve the purposes of sentencing under 18 U.S.C. §3553(a). The 28 months sentence we propose is not an arbitrary number. Rather, it allows for a 13-month downward variance to account first for the 10 months Edwin has spent in pretrial detention at the Metropolitan Correctional Center (the "MCC"), for which Edwin will not otherwise receive *any* credit towards his sentence, as well as an additional three months to account for the unduly harsh and inhumane conditions Edwin has endured there, beginning when the jail went under an extended lockdown in late February, and then for the last two months during the COVID-19 crisis. As described in more detail below, the MCC's intentional mishandling of the virus within its own walls has been dangerous and fraught with human rights violations. Like many others detained at the MCC, Edwin himself became extremely ill and suffered from symptoms consistent with COVID-19. However, the MCC refused to test him or provide any care for him whatsoever while he was sick.

Additionally, when the Court considers "the nature and character of the defendant" under Section 3553, we submit that Your Honor should consider Edwin's personal struggles, both growing up and as an adult, including the devastating loss of his father when he was 8 years old and his years of battling with his own mental health, learning disabilities and consequential drug abuse, and for these reasons sentence Edwin below the Guidelines.  Indeed, as the people closest to Edwin describe him, he is a completely different person when he is not under the influence of drugs, one who is "capable of beautiful sentiments with his daughters, myself, his siblings, and other people." (Letter from Maria Lopez, Edwin's mother.) His girlfriend, Enid Fernandez, who has known Edwin for 10 years writes:

> Edwin is a very caring and loving father to his children; it is one of the many reasons I decided to make a family with him …Having known him for this long I have seen many sides of Edwin and it is clear to me that he lacks many things and I believe one of those is love, love for himself particularly… Edwin has expressed time and time again how awful he feels about what he has done and where he allowed drugs to take him but he understands he needs help and cannot continue to waste his life and miss out on precious moments with his family and children.

These letters describe a man with redeeming qualities deserving, we submit, of the Court's leniency.  We also ask that Your Honor order that Edwin's sentence in this case run concurrent to any sentence he ultimately faces in his open Bronx County case which he intends to resolve as soon as possible.

**The Nature and Character of the Defendant Support A Below-Guidelines Sentence**

### Edwin Lost His Father at a Young Age, Had No Positive Male Role Model and Suffered Significant Learning Disabilities

Edwin was born on July 15, 1985 in Upper Manhattan.  Although his parents, Maria Lopez and Raul Gonzalez, lived together, their relationship was far from stable.  Edwin's father was unfaithful and physically abused his mother.  As Edwin describes it, his father would come and go from their home as he pleased, sometimes not returning at night.  Although he worked as a mechanic, Edwin's father also sold (and abused) narcotics.  As described in the PSR, when Edwin was young, his father would take Edwin with him to "the streets" while he and his friends sold and used drugs.  Sometimes his father would forget about him and leave him out there until his mother came to pick him up.  Edwin's father ultimately died of a cocaine overdose when Edwin was just 8 years old.

His father's death was hard on Edwin, not only because he idolized him as a young child, but because after his death Edwin's mother began to take her anger out on Edwin.  Edwin, for some psychological reason, reminded his mother of her philandering and abusive spouse, and she began abusing Edwin daily.  He recalls a specific episode when his mother hit him so hard with television cables that it left marks and Child Protective Services ("CPS") was called to his home and interviewed him.  During the interview, Edwin lied to CPS about what had happened.  This

2

was based on the advice of his mother, who had told him that if he told the truth he would be taken away from her.

Edwin has since mended his relationship with his mother, who through the process of this case has been supportive of him and actively engaged in his defense. She also takes some responsibility for Edwin's shortcomings. She writes to the Court: "I regret how tough I was on him during his upbringing. Recently I've come to think that raising him with a basis in love would have been the better approach[.]"

However, the loss of his father and abuse have taken their toll on Edwin. He has suffered from mental health issues for as long as he can remember. Department of Education records in our possession indicate that his mom started taking him to the Metropolitan Center for Mental Health on the Upper West Side when he was approximately 11 years old. As described in the PSR, Edwin participated in mental health counseling on and off throughout his pre-teen and teenage years.

Edwin's education records also indicate that he attended four different schools before the age of 11, repeated two grades in elementary school, and went to three different middle schools. At the start of middle school, Edwin was finally moved to a Special Education program, and was classified as having "mild retardation." These records show that Edwin had long been unable to cope in a regular classroom and struggled to read, decode, and retain information. (Edwin reports to us that he still struggles with dyslexia, which continues to impair his ability to read.)

Unable to keep up with his peers, frustrated by the tense environment at home, and without stability in his life, Edwin acted out at school and got himself into trouble. At age 14, he was sent to the Horizon Juvenile Center in the Bronx. There, he was taken advantage of by a correctional officer, who used Edwin as an "enforcer" and physically abused him for his own entertainment: he made Edwin engage in physical fights with the other kids and would reward him with food and time playing video games. When Edwin started to refuse, the officer physically attacked Edwin and then had him sent to the Crossroads Juvenile Center in Brooklyn, further away from home.

Edwin attended the High School for Fashion Industries in Manhattan between 9th and 11th grade when he was ultimately dismissed for missing too many days of school (due to his having been sent to juvenile detention). Edwin did not re-enroll in high school at that time. Years later, while incarcerated in the State system, he tried in vain to pass his GED exam. This is not surprising given his long history of learning disabilities.

**Edwin Has Struggled with Drug Addiction, Including at the Time of the Instant Offense**

Before his father's death, Edwin grew up watching his father and uncle not only sell cocaine but abuse it as well. Given his own depression and life-long frustration with his learning deficiencies, Edwin ultimately turned to drugs as a source of self-medication. Edwin started drinking and smoking marijuana at age 14, but since then has also used cocaine, heroin, ecstasy, Percocet, PCP, codeine and "lean" (an opioid concoction usually made from cough syrup containing codeine).

3

While Edwin has abused several different drugs over the years, he has mostly struggled with opioid addiction, which started when he was prescribed Percocet after two separate hospitalizations. At the height of his addiction, when he was unable to obtain Percocet either by prescription or on the street, Edwin would use heroin or lean. As the Court is likely aware, opioid addiction has reached the level of a national epidemic and is exceedingly difficult to break and unfortunately often results in relapse. The video footage provided to us in discovery makes clear that Edwin was on drugs when he engaged in the conduct charged in this case. Without diminishing the severity of his actions, the video itself shows that Edwin was high as a kite when he committed the instant offense and can be seen dancing around the gas station convenience store like a buffoon. The attendant at the register was actually known to him, as Edwin had often shopped there and had even previously lent the attendant some money. Prior to asking him to hand over the contents of the register, Edwin spent five minutes "bopping" around the store, dancing to music that was just as likely playing in his own head as it was playing in the store itself. The video makes clear that Edwin was not "all there" at the time.

Edwin is determined to strive for a clean, drug free life when he is released from prison. Edwin's mother shares in her letter to the Court: "Edwin has often conveyed to me his grievances and lamented to me how much of his life he's wasted so far. Every day he reflects and further regrets his erroneous judgment in his life decisions so far." As Edwin's girlfriend, Enid Fernandez says, Edwin knows "where he allowed drugs to take him" and understands that "he needs help and cannot continue to waste his life and miss out on precious moments with his family and children." Edwin has had prior success in keeping clean for months on end and successfully weaned himself off the methadone he had been prescribed when he was first detained in this case. Edwin has remained drug-free since that time. To help him with his addiction, we ask the Court to recommend Edwin for drug treatment wherever he is designated.

### Edwin's Mental Health Struggles Continued Into Adulthood

Edwin has continued to suffer with depression. In 2014, while incarcerated at Riker's Island, Edwin told a doctor that he had suicidal thoughts and was placed on suicide watch. As described in the PSR, Edwin slit his wrist multiple times, but never cut deep enough to cause any serious damage.

Although he requested mental health treatment while at Riker's, staff there chose to medicate Edwin rather than provide him with counseling. Edwin was prescribed the drug Remeron, but he found that he became dependent on it to sleep. Edwin took the initiative to wean himself off the drug, even though it left him unable to sleep through the night for three months.

When it comes to his mental health struggles, Edwin is self-aware and recognizes that he needs mental health counseling. (Indeed, he has requested such counseling from the MCC over the past few months, but such requests have been ignored.) We ask that the Court recommend that Edwin receive mental health treatment as part of any sentence and term of supervised release.

### A Significant Downward Variance is Warranted Since Edwin Has Not Received any Credit Toward his Sentence During the Last 10 Months He Has Spent Detained at the MCC, Including Under Unduly Harsh Conditions Before and During the Current COVID-19 Crisis

Edwin was arrested and brought into federal custody on August 1, 2019. At the time,

4

Edwin had already been detained in a Bronx case.  As a result, unlike most other federal defendants whose sentences ultimately include time spent in pretrial detention, Edwin has not earned any time towards his sentence in this case during the last 10 months he has been in federal custody at the MCC.

Moreover, the time Edwin has spent at the MCC has been under extraordinarily and unprecedently harsh conditions.  Before the start of this year, a number of Judges in this District had recognized the horrendous conditions at the MCC and provided downward departures at sentencing for defendants who have been detained there.  *See, e.g.*, *United States v. Saldana*, 17 Cr. 512 (KMW), Dkt. No. 535 at 16-17 (S.D.N.Y. Sept. 10, 2019) ("I am aware the conditions at the MCC are very dreadful, and it is my intention to give every defendant who has suffered in that way a break because of that."); *United States v. Behr*, 2006 WL 1586563, *5 (S.D.N.Y. June 9, 2006) (Sweet, J) (recognizing harsh conditions at MCC were unacceptable pretrial punishment and sentencing defendant below Guidelines).  A video taken one year ago, but recently released by the Daily News shows some of those horrific conditions, including rodents, mold and overcrowding in tight quarters.[1]  We understand from Edwin and other clients at the MCC that the video accurately depicts living conditions at the MCC.

However, starting in February 2020, the already poor conditions at the MCC became exceedingly worse.  First, on February 27, 2020, the MCC went into an almost two-week long lockdown while staff searched for a loaded gun which sources said had been smuggled in.  Although it is reported that the gun was located relatively quickly, MCC remained on lockdown until March 11, 2020, while corrections officers scoured the facility for other contraband items.  Edwin reports to us that personal items of his, including books and papers, were taken, ripped up and discarded.  During this time, all inmates housed in the MCC were required to spend the entire day in their cells. They were not allowed to shower, they were not provided with clean clothes or clean sheets (they were forced to wash their bodies and undergarments in the sink), they could not use the toilet in privacy, and they were provided only cold food.  All legal and social visiting was cancelled.

Then, with the lockdown barely lifted, on March 13, 2020, the BOP and MCC enforced new restrictions on inmates due to the unprecedented pandemic caused by the outbreak of COVID-19. All social and legal visiting was canceled for 30 days (such cancelation has since been extended), people were again locked in their cells for 23 hours at a time, with quarantine-like restrictions placed on inmates who already live in close quarters and have no ability to practice social distancing.  The MCC stopped serving normal meals, and instead has taken to providing only one hot meal a day, usually at lunch, while breakfast and dinner consist of cold or frozen cold cuts (Edwin reports to us having to run hot tap water over frozen ham sandwiches for dinner) and at times have consisted of food that has past its expiration date according to the dates on the

---

[1] *See* Stephen Rex Brown, *SEE IT: Contraband Video Gives Rare Look at 'Disgusting' Conditions Inside Manhattan Federal Jail*, THE DAILY NEWS, Apr. 27, 2020; available at https://www.nydailynews.com/new-york/ny-mcc-video-disgusting-conditions-20200427-7jnmpcbnovasphw32cm3pj677q-story.html

packaging.

Forced to remain together in such a small and unhygienic space, everyone became terrified of contracting the potentially fatal Corona virus. Many detainees began to exhibit symptoms of COVID-19, but did not want to admit it out of fear that they would be sent to isolation in the Segregated Housing Unit ("SHU"), which is normally reserved for punishment. But then even the SHU reached capacity.

Edwin reports to us that, like many other detainees in his unit, he himself experienced symptoms consistent with COVID-19. At the end of March and into the month of April, he was terribly ill, with head pain and body aches, no sense of taste or smell. The head pain Edwin experienced was particularly severe since he already suffers from chronic migraines. He asked to see a doctor but was refused and told that, unless he had a high fever, they could not help him. Edwin fought the virus in his own cell without so much as Tylenol or a cough drop. He tells us that these were the worst days of his life. He has been asking to see a mental health counselor ever since, also to no avail.

The way the MCC has handled the COVID-19 outbreak, by first failing to adequately protect its inmates from transmission and then by refusing to test those with symptoms – has been nothing short of bad faith and a cover-up by the BOP. As of the date of this submission, the MCC admits to only testing nine inmates total, and has been touting that it only has five inmates who have tested positive. These numbers prove the sheer lack of testing by the MCC, and that the MCC has sought to suppress the truth rather than the virus itself. As was recently reported by the Daily News, and as is supported by information from correctional officers inside that jail, the MCC has been severely downplaying its official numbers of COVID-19 cases to "obscure the magnitude of the crisis" when this virus is in fact "raging" through its facility.[2] Reports show that any prison that is actually testing is finding mass infection at rates significantly higher than any place in the outside world.[3]

We encourage the Court to review the papers filed on April 28, 2020 in a class action lawsuit against the MCC's warden, *Fernandez-Rodriguez v. Licon*, 20 Cv. 3315 (ER), pending before Judge Ramos in this District. We attach hereto as an Exhibit the Petition filed in that lawsuit

---

[2] *See* Noah Goldberg and Stephen Rex Brown, Coronavirus pandemic rages at NYC's federal jails — and numbers back lawyers' and staffers' claims that management has a poor grip on the problem, DAILY NEWS, Apr. 20, 2020; available at https://www.nydailynews.com/coronavirus/ny-coronavirus-mdc-mcc-bop-20200420-t25khpqxkfdqfmpvixxvlvxqfm-story.html.

[3] *See* Cary Aspinwall and Joseph Neff, These Prisons Are Doing Mass Testing For COVID-19 – and Finding Mass Infections, THE MARSHALL PROJECT, Apr. 24, 2020; available at https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections?utm_source=The+Marshall+Project+Newsletter&utm_campaign=aa581d2c1c-EMAIL_CAMPAIGN_2020_04_25_11_44&utm_medium=email&utm_term=0_5e02cdad9d-aa581d2c1c-174299869.

and note that the deeply disturbing details provided from inmates about the conditions at the MCC and the number of inmates who have been seriously ill and have exhibited tell-tale symptoms of COVID-19 match the information we are hearing from Edwin and other clients inside the MCC. We also attach the declaration of a doctor who visited the Metropolitan Detention Center ("MDC") in Brooklyn and found that the same "practices" being implemented by the MDC to purportedly diagnose and protect people from the spread of COVID-19 are a "serious deviation from accepted standards" and "put detainees and staff at grave risk of infection, serious illness and even death."[4] There can be no credible claim that conditions are somehow different at MCC.

### Courts Can Grant Sentencing Relief Under the Guidelines Based on Unduly Harsh Conditions of Pretrial Confinement Such as the Inhumane Conditions at the MCC

Courts in the Circuit have long recognized that sentencing courts can grant relief in the form of downward departures and variances based upon unduly harsh treatment in pretrial custody. The rationale behind the basis of such relief, whether expressed or implied in published opinions, has been two-fold: the first is one of equitable compensation for excessive hardship by treating both suffering and time as components of punishment and reducing the time component of the defendant's sentence accordingly.  The second is the need to deter those correctional authorities within the courts' jurisdiction from causing or tolerating the abhorrent conditions that produced such excessive punishment in the first place.  In this case, we believe that particularly meaningful sentencing relief should be granted based upon a third rationale that relates to deterrence: the need for the Court to show institutional condemnation of the gross negligence and indifference by MCC officials that resulted in wholesale suffering by pretrial and already sentenced inmates in this District under their care, and similar condemnation of the misrepresentations and intentional coverup of the COVID-19 crisis inside walls of the MCC.

The Second Circuit has expressly stated that abnormally harsh pretrial conditions can be grounds for a downward departure. *See United States v. Carty*, 264 F. 3d 191 (2d Cir. 2001). Since *Carty*, other courts in this Circuit have followed suit in granting downward departures or variances under 18 U.S.C. §3553(a) based upon harsh pretrial confinement conditions, whether the condition suffered was long in duration or short and acute. *See, e.g., United States v. Torres*, 2005 WL 2087818 at *2 (S.D.N.Y. Aug. 30, 2005) (McKenna, J) (downwardly departing because the "enhanced deprivations . . . and suffering" by the defendant who was held in pretrial detention in Colombia would produce "a magnitude of punishment effectively disproportionate"); *United States v. Mateo*, 299 F.Supp.2d 201, 204-12 (S.D.N.Y. 2004) (Judge Marrero downwardly departing nine levels where denial of medical attention and sexual harassment of a female inmate "inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration proscribed by the Guidelines"); *United States v. Speed Joyeros*, S.A., 204 F. Supp. 2d 412, 441 (E.D.N.Y. 2002) (Judge Weinstein downwardly departing because of, inter

---

[4] *See* Dr. Homer Venters' April 30, 2020 Facility Evaluation: Metropolitan Detention Center COVID-19 Response.

7

alia, "the physical deterioration of the defendant" while in pretrial custody); *see also United States v. Roseboro*, 402 Fed. Appx. 657 at *2 (2d Cir. 2010) (District Court properly discharged its procedural obligations under 3553(a), including considering harsh pretrial conditions, before imposing sentence); *United States v. Fajardo*, 2006 WL 3498640 at *3-4 (S.D.N.Y. Dec. 5, 2006) (Sweet, J.) (taking note of substandard pretrial conditions under Section 3553(a) for purposes of determining proper sentence).

While most of the cases cited above granted "departures," we submit that the grounds asserted in those instances also provide justification for "variances" under 18 U.S.C. §3553(a). Among the 3553(a) sentencing factors implicated here are "just punishment" under 3553(a)(2)(A) and "[needed] correctional treatment" under 3553(a)(2)(D).

### The Amount of Sentencing Relief Should Also Reflect the Court's Condemnation of the Gross Negligence, Indifference and Misrepresentations of Prison Officials Who Denied and Exacerbated the Spread of COVID-19 Within the MCC

Courts are understandably reluctant to interfere with the details of prison administration. That reluctance, however justifiable as a day-to-day proposition, should not interfere with the obvious need to deter future wholesale Eighth Amendment violations, like the ones here which would shock the conscience of our entire community, by granting substantial sentencing relief to the inmates who suffered. The same inherent powers of the court that operate to deter future violations of the Fourth Amendment rights of innocent citizens by freeing those that may be guilty, *see United States v. Calandra*, 448 U.S. 338, 348 (1974), or that enable the court to "establish and maintain civilized standards of procedure and justice," *United States v. Baird*, 414 F.2d 700, 710 (2d Cir. 1969) (*citing McNabb v. United States*, 318 U.S. 332, 340 (1943), should operate to deter these constitutional violations as well, and not merely rely upon the potential for prisoners to bring lawsuits for damages or requests by the Justice Department for prison monitors. *See Jackson v. District of Columbia*, 254 F.3d 262 (2002) (federal courts have the "inherent power" to protect prisoners while they exhaust their administrative remedies); *see also United States v. Sanchez-Gomez*, 859 F.3d 649, 655-66 (9th Cir. 2017) (*rehearing en banc*) (relying in part upon court's "supervisory authority" to provide broad relief in dealing with Marshals' blanket policy of shackling prisoners in pretrial proceedings that denied defendants' right to "respectful treatment").

As the cases we have cited suggest, the amount of sentencing relief that should be afforded in cases of egregious pretrial punishment, like any sentencing decision, needs to be case-specific. We respectfully submit, however, that the relief afforded should be substantial enough to make a loud statement of condemnation by the Court about the horrific conditions endured by the inmates caused by the MCC that not only failed to adequately protect detainees from the virus, but then refused to test and treat inmates with the virus so that it could continue to deny any transgression on its part. We believe that such action with respect to the sentencing treatment of the inmates involved would be appropriate and analogous to the principles of punitive damages, as are available and often awarded to plaintiffs who suffer Eighth Amendment violations in prison. In *Smith v. Wade*, 461 U.S. 30 (1983), the Supreme Court famously held that a prison guard could be held liable for punitive damages based upon reckless or careless disregard or indifference to

inmate's rights and safety in a civil rights action under 42 U.S.C. §1983, even in the absence of proof of actual malicious intent. The reason, the Court stated, is that the purpose of punitive damages is not to compensate the inmate but to act as a deterrent to those guards who might in the future violate a prisoner's rights in such a reckless, careless or indifferent manner. *See id.; see also McFadden v. Sanchez*, 710 F.2d 907, 913 (2d Cir. 1983) ("An award of punitive damages punishes a defendant who has acted intentionally or recklessly to deny a plaintiff his protected rights and helps secure rights for others by deterring future violations"). The amount of punitive damages is a function of the "reprehensibility" of the conduct involved, and fraud is one element of reprehensibility. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575 (1996); *see also Blissett v.* Coughlin, 66 F.3d 531 (2d Cir. 1995); *Barrett v. United States*, 651 F. Supp. 615 (S.D.N.Y. 1986) (Motley, J.) (evidence of fraud admissible as foundation for the awarding of punitive damages).

### Other Courts in the Southern and Eastern District Have Reduced Sentences Based on the Inhumane Conditions at the MCC and MDC

Although the number of sentencing proceedings have been few over the past two months (since courts have not been going forward with all proceedings and have for the most part operated remotely), given the magnitude of horrors endured by those detained at the MCC and MDC during this unprecedented pandemic and the caselaw described above, it is not surprising that courts in this District have reduced the lengths of sentences on the basis of the unduly harsh pretrial conditions suffered by those defendants. *See, e.g., United States v. Morgan,* 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (cutting sentence to less than half of low end of stipulated guidelines based in part on conditions at MDC during pandemic, and condemning awful conditions at both MCC and MDC even prior to current crisis); *United States v. Casillas*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing length of sentence in part based on conditions at MCC during COVID-19 crisis); *United States v. Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant detained at MDC).

We submit that this Court should do the same for Edwin, who, as described in detail above, has not only endured unprecedently harsh conditions at the MCC, but who himself contracted what was undoubtedly the COVID-19 virus during his confinement, but was left to suffer the debilitating and painful virus on his own, without any treatment to ease his discomfort or help him recover.

### The Court Can – and Should – Order This Sentence to Run Concurrent With the Sentence to be Imposed in Edwin's Pending Bronx County Case

Section 5G1.3(d) of the United States Sentencing Guidelines states that, whether or not an undischarged sentence arises from relevant conduct, the federal sentence "may be imposed to run concurrently, partially concurrently, or consecutively ... to achieve a reasonable punishment for the instant offense." 28 U.S.S.C. § 5G1.3. The Supreme Court and the Second Circuit have held that it is within a district court's discretion to order that a federal sentence run concurrent with a yet to be determined state sentence. *See Setser v. United States,* 566 U.S. 231, 236-37 (2012); *United States v. Ojeda*, 946 F.3d 622, 627-30 (2d Cir. 2020); *United States v. Olmeda*, 894 F.3d

9

89, 94 (2d Cir. 2018).

Edwin expects to resolve his Bronx court case as soon as practicable. As we previously told the Court when we wrote to postpone his original sentencing date in this case, Edwin was scheduled to appear in the Bronx for that case on March 9, 2020. He had hoped to resolve that case or at least receive clarity on how it would be resolved at that appearance. However, the Marshals would not take him due to the lockdown at the MCC that began in February described above. Given the current COVID-19 crisis, there has been no new date scheduled for Edwin to appear in the Bronx. We have been in touch with Edwin's attorney for that case and we understand that an offer in that case will be forthcoming, and that it is expected include a significant amount of imprisonment. We submit that having Edwin serve consecutive sentences would not serve the ends of justice.

**Given all of These Factors a 28-Month Sentence is Appropriate**

We acknowledge that Edwin has a significant criminal history and the seriousness of his conduct in this case. However, we also submit that there are several mitigating factors here that warrant a significant downward variance. Taking into account Edwin's criminal history and personal characteristics, Probation recommended a 41-month sentence (the low end of the guidelines). However, in making that recommendation, Probation did not account for the fact that Edwin will not receive any credit for the 10 months he has already spent in federal custody. Nor did they account for the unprecedently harsh conditions Edwin has been subjected to during the past three months at the MCC, including when he himself suffered from what was likely COVID-19. (Nor could they – his probation interview was in January, well before anyone could have predicted this pandemic, or the horrors that would ensue at the MCC as a result.) Taking all of these factors into account, and as is described in detail above, we submit that a 28-month sentence, ordered to run concurrent with his yet to be determined state sentence, with significant supervised release to follow, is appropriate. We also ask that the Court recommend Edwin for mental health and drug treatment during his imprisonment and term of supervised release.

Respectfully submitted,

*Sarah M. Sacks*

Sarah M. Sacks, Esq.
Epstein Sacks PLLC